IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 23, 2021 Session

## STATE OF TENNESSEE v. DARIOUS FITZPATRICK

**Appeal from the Circuit Court for Maury County**
**No. 24232     Robert L. Jones, Judge**

_____

### No. M2018-02178-CCA-R3-CD

_____

The Defendant, Darious Fitzpatrick, appeals as of right from his convictions for first degree felony murder, second degree murder, and especially aggravated robbery, for which the trial court imposed an effective sentence of life plus twenty years. The Defendant's sole issue on appeal is whether his sentence is unconstitutional in light of his status as a juvenile at the time of the offenses. After a thorough review of the record and applicable law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Michael R. Meise (on appeal), Dickson, Tennessee; Kevin S. Latta (at trial), Columbia, Tennessee; and William M. Harris (in pretrial motions), Lawrenceburg, Tennessee, for the appellant, Darious Fitzpatrick.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Brent Cooper, District Attorney General; and Dan Rundle, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

This case arises from an October 20, 2014 incident in which the Defendant and Kavoyeh Pye[1] robbed a Columbia, Tennessee Papa John's restaurant ("Papa John's"), during which the Defendant fatally shot the only employee working, twenty-two-year-old

---

[1] Mr. Pye indicated during his trial testimony that he was separately charged with felony murder and especially aggravated robbery in connection with this incident.

Gordon Shaffer. The Defendant was seventeen years old and Mr. Pye was sixteen years old at the time of the incident. A series of delinquency petitions filed in the Maury County Juvenile Court collectively alleged that the Defendant committed first degree premeditated murder, first degree felony murder, and especially aggravated robbery.

On October 23, 2014, the State filed a motion to transfer the Defendant's case to circuit court. The juvenile court ordered a mental evaluation on November 14, 2014. The mental evaluation was introduced as an exhibit to the transfer hearing. The evaluation indicated that although the Defendant reported suffering from anxiety, attention deficit disorder, and depression, he did not meet the criteria for involuntary hospitalization; he was competent to stand trial; at the time of the offenses, he was not experiencing a mental disease or defect that caused him to be unable to appreciate the nature or wrongfulness of his acts; and no basis existed from which to argue diminished capacity. The evaluation also noted that the Defendant had a "[s]evere" cannabis use disorder and an "[u]nspecified type" conduct disorder. On March 31, 2015, the juvenile court granted the transfer order. The Maury County Grand Jury subsequently issued an indictment charging the Defendant with first degree premeditated murder, first degree felony murder, and especially aggravated robbery, a Class A felony. See Tenn. Code Ann. §§ 39-13-202, -403.

At trial, the evidence established that the Papa John's restaurant was located in a shopping center, which was adjacent to a residential neighborhood. The neighborhood contained a "cut through" in the rear fence line such that a person could walk to Papa John's from the neighborhood. The neighborhood was also located between the shopping center and Colonial Village Apartments.

Mr. Pye testified for the State. He acknowledged his charges stemming from the shooting and affirmed that although the State had not offered him a plea agreement in exchange for his testimony, he hoped to avoid a life sentence. Mr. Pye stated that as of the date of the shooting, he was acquainted with the Defendant but had not spent time with him. On the day of the shooting, Mr. Pye walked to his friend Octavious Gillespie's house to smoke marijuana. At some point, Octavious's older brother Majestik[2] pulled up to the house in his green Nissan Pathfinder SUV and asked them if they wanted to go play basketball. Octavious declined, but Mr. Pye accompanied Majestik to his car, where the Defendant was already a passenger. Instead of driving to the basketball court, Majestik drove to his apartment in Colonial Village and went inside. Mr. Pye noted that the Defendant was "moving real slow" and that they did not converse. Mr. Pye stated that he did not expect to participate in a robbery that day.

---

[2] Because Octavious and Majestik share a surname, we will refer to them by their first names. We intend no disrespect. In addition, although Majestik's name was spelled "Majestic" in the trial transcript, the presentence report indicated that the correct spelling is Majestik.

Mr. Pye testified that Majestik reappeared and beckoned to them to come inside. Once inside, Majestik asked if they were "ready." Mr. Pye asked to what Majestik was referring, and Majestik replied, "[R]eady to get some money." The Defendant called Mr. Pye "shaky" and "scared." Mr. Pye recalled the Defendant's holding a gun in the apartment, although Mr. Pye never saw a gun when they were in the car. Mr. Pye had seen the pistol before and believed it belonged to Majestik. Mr. Pye agreed that the Defendant's gun resembled the one in evidence. They all entered Majestik's car and while driving, Majestik repeatedly asked Mr. Pye, "[S]o brother, you going to go? You going to go?" Mr. Pye stated that he went with the men because Mr. Pye was scared and the Defendant had a gun. Majestik drove to the cut through, and it became apparent that Mr. Pye and the Defendant were going to "go in and get the money." Majestik identified which establishment they would rob and gave Mr. Pye a blue hooded sweatshirt, blue gloves, an orange Tennessee Vols ballcap, and a grocery bag. Mr. Pye told the men that he would not participate, but the Defendant raised his gun toward Mr. Pye and called him a "little b----" who was not "part of their friends." Although Mr. Pye did not wish to participate in the robbery, he did not think that the Defendant would allow him to leave.

Mr. Pye testified that he and the Defendant entered Papa John's, and the Defendant pointed his gun at the victim and demanded money. The victim was on the telephone, set it down, and did not speak. Mr. Pye stated that he took money from a register and started to walk away, thinking the robbery was over. Mr. Pye recalled the victim's telling them that it took time to open another register. The Defendant demanded money again, and Mr. Pye told the Defendant to "come on" and asked what he was doing. Mr. Pye ran out of Papa John's toward the cut through and heard two gunshots. When he reached the fence line, he undressed and tossed his outer clothing over the fence. Mr. Pye said that Majestik and the green Pathfinder were gone, so he walked back to Colonial Village Apartments, where he jumped into a dumpster because he was afraid. Mr. Pye saw Majestik walking in the parking lot, and Majestik beckoned Mr. Pye to come inside his apartment. Mr. Pye recounted the sequence of events and gave Majestik the cash he took from the restaurant. At this point, the Defendant entered the apartment. Majestik asked the Defendant why he shot "him," and the Defendant shrugged. Mr. Pye stated that the Defendant was not upset and "ready to go home." The Defendant told Majestik that he was taking the pistol home. Mr. Pye walked home because he did not want to get into a car with Majestik and the Defendant again. He acknowledged his statement to police that he had heard the Defendant ask Majestik if he could keep the pistol.

On cross-examination, Mr. Pye testified that before the robbery, the Defendant's speech was slurred and he had bloodshot eyes. However, Mr. Pye did not know whether the Defendant was "stoned." He acknowledged that he initially lied to police and denied involvement in the robbery. Mr. Pye averred that in addition to testifying in hopes of avoiding a life sentence, he was also testifying out of a sense of moral duty.

- 3 -

Papa John's general manager Steven Angus testified that at about 9:50 p.m. on October 20, 2014, he was speaking with the victim on the telephone during a customary end-of-shift call when the victim remarked, "Oh s--t, I'm getting robbed." Mr. Angus heard a male voice saying, "[G]ive me the money in the safe." Mr. Angus noted that the restaurant's safe had a time-delayed lock to deter robbers. Mr. Angus heard the victim explain that it took fifteen minutes to open the safe, to which the man responded, "I don't give a s--t, give me the money in the register." At that point, Mr. Angus hung up and called 911. He stated that between $250 and $300 was taken from the cash registers.

The Papa John's surveillance recording, which was received as an exhibit and played for the jury, captured three camera angles inside the store. One camera faced the front door and showed part of the dining area; the second showed a pizza oven and boxes high on the wall facing the cash register; and the third showed one cash register from behind the right side of the counter, which was open to the dining room. The left half of the third camera angle was obscured by a shelving unit containing stacks of pizza boxes.

In the recording, which was time-stamped 9:52 p.m., two men entered Papa John's; the first, who was identified by three police witnesses and Mr. Pye as the Defendant, wore dark clothing with a hood and a mask. The three police witnesses all asserted that they identified the Defendant by his unique gait. The Defendant was short and stocky, and when he walked quickly, he appeared to be hopping. In another portion of the recording, it was apparent that the Defendant had a wide stance and walked with his hips pitched backward. The Defendant led the way and held a black and silver pistol in his right hand.

Mr. Pye identified himself as the second man in the recording; he was taller and slimmer than the Defendant. Mr. Pye wore a blue hooded sweatshirt with the hood raised, a light-colored ballcap underneath the hood, and light-colored gloves. Mr. Pye had an empty grocery bag in his hand.

The Defendant walked toward the register counter and raised the gun. The Defendant turned to walk behind the right side of the register counter, and Mr. Pye followed. The camera facing the oven briefly showed the upper portions of the Defendant's, Mr. Pye's, and the victim's heads, but otherwise they were not visible in the recording during their initial interaction.

Mr. Pye reappeared behind the register counter after several seconds and stood near the end that was open to the dining area. The victim walked to the cash register and opened it using a key as the Defendant stood on the victim's left side with the gun pointed at him. The victim and Mr. Pye emptied the register drawer, and the victim removed the register

- 4 -

key and moved out of the camera frame.[3]  Mr. Pye moved about, eventually walking in front of the register counter before making a beckoning motion with his hand.  The Defendant also made a hand motion in Mr. Pye's direction.  Mr. Pye hesitated for a moment, then turned and walked out of the restaurant.

The Defendant shifted from side to side while the victim placed change in an envelope.[4]  After the victim handed the envelope to the Defendant, the Defendant walked to the edge of the register counter before turning and firing his gun at the victim twice.  The Defendant jogged out of the restaurant.  The victim, who was bent over slightly, walked to the edge of the register counter.  He unsuccessfully attempted to stand before bending over again.  The victim sat on his hands and knees on the ground and curled forward.  In the final seconds of the recording, the victim rolled on his side into a fetal position.

Stephanie Whitsett, who lived between Papa John's and Colonial Village Apartments, testified that on the night of the shooting, she saw a dark-colored SUV speed past her house and pick up someone near her neighbor's house before turning around and speeding away.  Ms. Whitsett did not recall further details about the vehicle or its occupants.  In Ms. Whitsett's police statement, which was taken two days after the shooting, she mentioned that the SUV was green.

Columbia Police Department (CPD) officers responded to the scene a short time after Mr. Angus's 911 call and found the restaurant empty except for the wounded victim, who was lying on the floor.  CPD Corporal Michael Johns testified that when they found the victim, he was semi-conscious and had "ashen" skin and labored breathing.  Former CPD officer Brian Gray testified that the victim conveyed that two Black men came in with a black handgun and that one of the men shot him.  The victim attempted to sit up but could not; Officer Gray noted that the victim's pallor was "grayish."  EMS workers arrived shortly after the officers; however, the victim died en route to Vanderbilt Medical Center.

Assistant Medical Examiner Dr. David Zimmerman determined that the cause of death was multiple gunshot wounds and that the manner of death was homicide.  The victim sustained a non-fatal gunshot wound to his right arm; however, a second gunshot wound to the right torso injured the victim's liver, diaphragm, spleen, and left kidney, causing fatal quantities of internal bleeding.

Former CPD Sergeant Scott Knudson and Detective Jason Sanders processed the crime scene and took photographs, and Patrolman Brandon Schroeder obtained the

---

[3] Mr. Angus testified that the restaurant contained two cash registers, both of which could be opened using a manager's key.  He also indicated that the safe was located beneath one of the registers.

[4] Several loose coins were found on the restaurant floor near the victim's body.

surveillance recording. Two .40-caliber shell casings and bullets were recovered in the restaurant. One shell casing and bullet were Federal brand, and the other shell casing and bullet were Speer brand.

The morning after the incident, CPD Officers Orlando Cox, Jamie Reed, and Billy Camargo went to the Defendant's mother's apartment, where the Defendant lived. After obtaining the Defendant's mother's consent to search the Defendant's bedroom, they found a .40-caliber pistol underneath his mattress. The pistol's magazine contained fourteen unfired bullets of differing brands, including Federal and Speer. When fully loaded with a bullet in the chamber, the pistol held sixteen bullets. According to Tennessee Bureau of Investigation Agent Alex Brodhag, an expert in firearms examination, ballistics testing reflected that the two .40-caliber bullets and shell casings recovered at the crime scene were fired by the Defendant's gun.

Detective Sanders testified that he ordered DNA testing in this case and that a latex glove and gray shirt found by the fence line of the cut through matched Mr. Pye's DNA. A black shirt from the same location contained DNA from Majestik's girlfriend. Detective Sanders acknowledged that no DNA or fingerprints matched the Defendant.

The Defendant voluntarily went to the police department for questioning. The Defendant's mother declined to accompany the Defendant and gave permission for the officers to interview the Defendant without her being present. Although the Defendant's police interview was not introduced as evidence, a video recording was entered of several spontaneous statements[5] the Defendant made during the span of several hours, during which he was alone in an interrogation room.

In this recording, the Defendant referred to his being charged with first degree murder and expressed concern that he would receive a life sentence, that he would "never see f--king daylight," and that he "should have [run] while [he] had the chance[.]" In another segment, the Defendant chuckled as he described someone as a "little head b---h" and an "Andy Griffith-looking a-s n----r[.]"[6] He also said, "All because of a f--king gun. D--n. [Should have] got rid of that." The Defendant also stated, "I ain't worried about this s--t dude, f--k it, worry about this m----rf----r, first degree murder, get out, be back on the same s--t." Finally, the Defendant said, "I don't regret shooting the n----r, f--k that n----r. I don't regret that . . . I regret getting f--king caught."

When asked whether he ordered tests to determine if the Defendant was intoxicated at the time of his arrest, Detective Sanders responded negatively, noting that the Defendant

---

[5] Eight video clips were compiled into one recording for trial; some of the statements were unintelligible.

[6] The record reflects that the victim was Caucasian.

never appeared to be intoxicated and that no blood believed to be from a suspect was present at the crime scene. Detective Sanders stated that the Defendant had just woken up when he went to the police station and characterized the Defendant's speech in the interview room recordings as mumbled rather than slurred. Detective Sanders added that had the Defendant been intoxicated, he would not have interviewed him. Detective Sanders opined that intoxication had no bearing on the Defendant's guilt.

Upon this evidence, the jury convicted the Defendant of the lesser-included offense of second degree murder in Count 1, first degree felony murder in Count 2, and especially aggravated robbery in Count 3.

During the penalty phase of the trial, which only related to Count 2, Mary Buckner, the victim's mother, described the devastating impact of the victim's death on her and her family. She requested that the jury sentence the Defendant to life without the possibility of parole because the Defendant had "no redeemable qualities"; Ms. Buckner noted that she would not "get paroled from this, [so] he shouldn't either." The Defendant made an allocution in which he stated, "I am sorry to both of y'all, to my mom and just for everything." The Defendant presented no evidence relative to mitigation. The jury imposed a sentence of life relative to Count 2.

At the sentencing hearing on Counts 1 and 3, Amanda Philyaw testified that she prepared the presentence report and that the Defendant declined to discuss the offenses with her, although he mentioned that he robbed Papa John's because he and his friends needed "more drug money." She said that beginning when the Defendant was fifteen years old, he had several adjudications of delinquency on his juvenile court record, which included two incidents of aggravated burglary, aggravated robbery, and criminal simulation. The Defendant had been placed on juvenile probation twice, had four violations of probation, and had previously been placed in Department of Children's Services (DCS) custody after one aggravated burglary incident. The Defendant's juvenile court record indicated that at the time of the incident in this case, the Defendant was on probation.[7] Finally, the Defendant had the following pending charges in the Maury County Circuit Court: aggravated assault in case number 26260; aggravated assault, facilitation of felony escape, vandalism, attempted felony escape, and assault with bodily injury in case number 24295; misdemeanor theft in case number 24229; aggravated robbery in 24230; and aggravated robbery in case number 24231.

Ms. Philyaw testified that the Defendant left high school in tenth grade for disciplinary reasons and that he was suspended for two days for bullying after an incident in which he hit another student. The Defendant reported "excellent" mental and physical

---

[7] The court record noted that on September 9, 2014, the Defendant was adjudicated delinquent for criminal simulation and counterfeiting and placed on probation.

health, although he also reported attending a thirty-day drug rehabilitation program at Bradford at age fourteen. The Defendant was expelled from the program on his last day after testing positive for marijuana. He also reported using marijuana, codeine, Lortab he stole from his brother, and alcohol before his incarceration. The Defendant reported that he had been treated at Centerstone for anxiety, depression, and attention deficit disorder. Ms. Philyaw was unable to obtain the Centerstone records because the facility was not authorized to release the Defendant's records to her.

Ms. Philyaw testified that she could not verify the Defendant's employment history, which he reported as working for a newspaper office for one week and for a boxing gym. The Defendant's Strong-R assessment indicated that he was a high risk for using violence, taking property, and using drugs. Ms. Philyaw elaborated that because the Defendant had rated as high risk in three areas, he was considered "criminally diverse."

The presentence report contained Mr. Pye's police statement, in which he stated that after the robbery the Defendant "seemed happy for some reason." The report also contained extensive police notes about the investigation. Officer Timothy Sanders wrote that the Defendant's cellmate in the juvenile detention center contacted police on March 31, 2015, and asked to speak to them about the Defendant. The Defendant's cellmate reported that the Defendant had implicated Mr. Pye as the other person who participated in the robbery and that the Defendant "claimed he killed [the victim] in order to 'get a teardrop,'" which referred to a tattoo symbolizing that a person had "taken a life." Officer Neylan Barber interviewed Octavious, who overheard the Defendant saying that he "got [him] a body." Octavious told Officer Barber that the Defendant "was always stating" that he wanted to kill someone and get a teardrop tattoo. Octavious reported that the Defendant explained that he shot the victim "due to him not opening the safe."

Maury County Circuit Court Clerk Sandy McLain testified that she was records custodian for the Maury County Juvenile Court. Ms. McClain stated that on May 14, 2013, the Defendant committed aggravated robbery of a Cash Express business and was placed in DCS custody. She stated that circuit court case numbers 24230 and 24231 related to the aggravated robberies of two Dollar General stores on October 13, 2014, and October 17, 2014, respectively. On October 21, 2014, the Defendant committed misdemeanor theft of a handgun. After the Defendant was arrested for the incident in this case, on January 17, 2015, the Defendant was charged with aggravated assault, assault, vandalism, attempted felony escape, and conspiracy[8] to commit felony escape in connection with an incident at

---

[8] Ms. McLain testified that the Defendant had been charged with conspiracy to commit felony escape, but the presentence report and printout of the Defendant's juvenile record indicated that he was charged with facilitation.

the juvenile detention facility. On October 17, 2017, the Defendant committed aggravated assault while in custody.

Officer Camargo testified that he investigated the May 14, 2013 Cash Express robbery. His investigation indicated that the Defendant pointed a gun at the clerk during the robbery.

Detective Sanders testified that in the Defendant's police interview in this case, the Defendant confessed to the shooting. The Defendant said that he shot the victim because he wanted the victim to open the safe, but the victim could not. During the interview, the Defendant also confessed to the Dollar General robberies, in which he also used a gun.

The trial court found that the Defendant was a Range I, standard offender and that the sentencing range for both Count 1, second degree murder, and Count 3, especially aggravated robbery, was fifteen to twenty-five years. Relative to mitigating factors, the court noted the Defendant's youth. See Tenn. Code Ann. § 40-35-113(6). However, the court discussed that in mitigation for a defendant's youth, the court was required to find that the Defendant lacked substantial judgment because of his youth. The court found that "the evidence strongly suggests that [the Defendant] had been engaged in several other robberies," allowing time for reflection before the Papa John's robbery. As a result, the court "[c]ould not find that youth alone contributed to his lack of substantial judgment."

Relative to enhancement factors, the trial court found that the Defendant had a history of criminal behavior in addition to that necessary to establish his range and that the Defendant was adjudicated to have committed delinquent acts that would have been felonies if he were an adult. See Tenn. Code Ann. §§ 40-35-114(1), (16). The court "merge[d]" its consideration of the two factors and stated that "at least one enhancing factor" existed. The court also found that the Defendant was on probation at the time he committed the offenses. See Tenn. Code Ann. § 40-35-114(13)(C). Relative only to Count 1, the court found that the Defendant committed the offense using a deadly weapon. See Tenn. Code Ann. § 40-35-114(9). Relative only to Count 3, the court found that the Defendant was a leader in the commission of an offense involving two or more criminal actors. See Tenn. Code Ann. § 40-35-114(2). The court summarized its findings and stated that "at least three serious enhancing factors" existed for the two convictions. The trial court imposed a sentence of twenty years each for Counts 1 and 3 and merged Count 1 with Count 2, felony murder.

Relative to consecutive sentencing, the court found that the Defendant committed the offenses while on probation and that the Defendant was a "very dangerous offender." See Tenn. Code Ann. §§ 40-35-115(b)(4), (6). The court noted the Defendant's statement to Detective Sanders that he killed the victim because the victim could not open the safe and that no provocation existed for the Defendant to shoot him. The court found that the

Defendant's conduct during the robbery and on "earlier occasions" indicated little or no regard for the value of human life and "essentially no hesitation in committing crimes in which the risk to human life is high." The court noted that although the Defendant's criminal record was "not a strong factor at this time," he had "what [was] becoming an extensive criminal record" and that the court was "reluctant" to find that the Defendant was a "professional criminal." The court ordered that the sentence in Count 3 be served consecutively to the life sentence in Count 2, resulting in a total effective sentence of life plus twenty years in confinement.

In his motion for new trial, the Defendant argued, in relevant part, that Tennessee's life sentence, which consists of fifty-one years before a defendant is eligible for parole, violated the Eighth Amendment proscription of cruel and unusual punishment when applied to a juvenile. After the trial court denied the motion, the Defendant timely appealed.

## ANALYSIS

On appeal, the Defendant contends that (1) his sentence of life plus twenty years is unconstitutional because it is constructively a sentence of life without the possibility of parole or, alternatively, a death sentence; (2) the trial court should have conducted a separate sentencing hearing and made findings of fact relative to the Defendant's incorrigibility as mandated by Miller v. Alabama, 567 U.S. 460 (2012); and (3) that the "evolving standards of decency," as reflected in United States Supreme Court jurisprudence regarding sentencing for juvenile offenders, scientific research on brain development, and international practices, should persuade this court to conclude that the Defendant's sentence is unconstitutional.

The State responds that the Defendant's precise sentencing issues were not raised in his motion for new trial and should only be reviewed for plain error. The State also argues that Miller is inapplicable to the Defendant's case and that the Defendant was afforded ample opportunity to present mitigation evidence but made a tactical decision not to do such. Finally, the State construes the Defendant's request for this court to remand the case for a Miller hearing as one relating to the effectiveness of trial counsel.

In his reply brief, the Defendant repeats his argument that "it is time" for Tennessee's courts to effect a change in policy regarding lengthy sentences for juvenile offenders. He also emphasizes that the Defendant, who was twenty-one years old at the time of his trial, was incapable of meaningfully assisting his attorneys in his defense, including understanding the importance of mitigation evidence. The Defendant avers, however, that the trial court bore the ultimate duty of conducting a Miller hearing and making a specific finding that the Defendant was incorrigible.

- 10 -

As a preliminary matter, we are inclined to give plenary review to the Defendant's sentencing issues notwithstanding the failure to raise them in the motion for new trial. First, we note that the case upon which the State bases its argument, State v. Gomez, 239 S.W.3d 733, 737 (Tenn. 2007), had a unique procedural posture.[9] Further, our reading of the opinion does not reveal an instruction from our supreme court to distinguish between constitutional sentencing issues and substantive or procedural ones. Lastly, our precedent counsels in favor of considering issues of sufficiency of the evidence and sentencing regardless of whether they were included in a motion for new trial. See, e.g., State v. Bough, 152 S.W.3d 453, 460 (Tenn. 2004); State v. Steven Michael Odom, No. W2018-00634-CCA-R3-CD, 2019 WL 1126068, at *5 (Tenn. Crim. App. Mar. 12, 2019); see also Tenn. R. App. P. 3(e).

I.    Constructive Life Without Parole or Death Sentence

In Miller, the United States Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'"  567 U.S. at 465.  The Court did not prohibit a sentence of life without parole for all juveniles convicted of murder. Id. at 479. Rather, the sentencer must consider "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." Id.  A judge or jury must have the opportunity to consider mitigating circumstances before sentencing a juvenile to life without parole. Id. at 489.  In 2016, the Court held that Miller applied retroactively. Montgomery v. Louisiana, 577 U.S. 190 (2016) (as revised Jan. 27, 2016). In Montgomery, the Court discussed Miller's holding as follows:  "Although Miller did not foreclose a sentencer's ability to impose life without parole on a juvenile, the Court explained that a lifetime in prison is a disproportionate sentence for all but the rarest of children, those whose crimes reflect 'irreparable corruption.'" Id. at 195 (quoting Miller, 567 U.S at 479 (quoting Roper v. Simmons, 543 U.S. 551, 573 (2005) (holding that death sentences for juvenile offenders violated the Eighth Amendment))).

---

[9] Our supreme court examined the defendant's sentencing issue for plain error in his first Rule 11 appeal. See State v. Gomez ("Gomez I"), 163 S.W.3d 632, 648-49 (Tenn. 2005).  Subsequently, the United States Supreme Court vacated the judgment and remanded the case to our supreme court in light of new authority. Gomez, 239 S.W.3d at 737.  In the opinion on remand, our supreme court stated, "Because we have determined that the Defendants are entitled to relief for plain error, we decline to readdress whether the Defendants properly preserved their Sixth Amendment claim for plenary review." Id.  We also note that this court has confined its application of plain error to the specific circumstances in Gomez. See, e.g., State v. Montreal Lyons, No. W2006-02445-CCA-R3-CD, 2008 WL 2699657, at *6 (Tenn. Crim. App. July 9, 2008).

The Defendant recognizes that a split between the states and federal circuits exists regarding whether to apply Miller to aggregate sentences, and he candidly acknowledges that this court has repeatedly declined to apply Miller outside the context of mandatory life without parole sentences. The power to break with well-established precedent does not lie with this court, and we are not prepared to expand the parameters of the Eighth Amendment in this regard, notwithstanding the fact that the Defendant's sentence "may push, and possibly exceed, the bounds of his life expectancy[.]" State v. Steven King, No. W2019-01796-CCA-R3-CD, 2020 WL 5352154, at *2 (Tenn. Crim. App. Sept. 4, 2020); see Charles Everett Lowe-Kelly v. State, No. M2015-00138-CCA-R3-PC, 2016 WL 742180, at *1 (Tenn. Crim. App. Feb. 24, 2016) (concluding that Miller did not apply to the petitioner, who committed offenses as a minor, because he did not receive a life without parole sentence. The petitioner received two consecutive life sentences served concurrently with nine fifteen-year sentences). Similarly, the Defendant's comparison of his effective sentence to the death sentence proscribed by Roper is not well-taken. A lengthy prison sentence does not implicate the same constitutional concerns as execution by the State.

Likewise, the Defendant's argument that the trial court's discretion to impose consecutive sentencing "negate[d]" the jury's supposed finding that the Defendant was redeemable is without merit. Miller has no bearing on how a sentencing regime treats multiple convictions, and the trial court was well within its discretion to order consecutive sentencing in this case. See Tenn. Code Ann. § 40-35-115(b)(4) ("The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high."); (6) ("The defendant is sentenced for an offense committed while on probation."). The Defendant killed the victim in cold blood because he was unhappy that the victim could not open the time-delayed safe. He indicated to the presentence report officer that he committed the robbery to obtain drug money. The police investigation notes in the presentence report documented Mr. Pye and Octavious's statements to them that the Defendant was "excited" to have killed a person because he wanted a teardrop tattoo. The Defendant stated in the police interrogation room that he did not regret shooting the victim, but rather regretted that he was caught. Finally, the Defendant had a history of escalating, violent criminal behavior, and he was rated as a high risk to reoffend. The Defendant is not entitled to relief on this basis.

II.     Necessity of Separate Miller Hearing and Finding of Incorrigibility

Tennessee Code Annotated sections 39-13-202(b) and 39-13-207 state that a juvenile convicted of first degree murder may be sentenced to either life or life without the possibility of parole. In cases in which, as here, the State seeks a sentence of life without parole, a separate proceeding is conducted for the jury to determine whether to impose a

- 12 -

sentence of life or life without parole. Tenn. Code Ann. § 39-13-207(a). The jury "shall weigh and consider the statutory aggravating circumstance or circumstances proven by the [S]tate beyond a reasonable doubt and any mitigating circumstance or circumstances." Tenn. Code Ann. § 39-13-207(d). Mitigating circumstances include the defendant's youth at the time of the offense. Tenn. Code Ann. § 39-13-204(j)(7). This court has consistently held that this procedure was sufficient to protect the Defendant's constitutional rights in light of <u>Miller</u> and <u>Montgomery</u>. <u>See</u> <u>Jacob Brown v. State</u>, No. W2015-00887-CCA-R3-PC, 2016 WL 1562981, at *7 (Tenn. Crim. App. Apr. 15, 2016); <u>James Ellison Rouse v. State</u>, No. M2018-00926-CCA-R3-PC, 2019 WL 3814624, at *5 (Tenn. Crim. App. Aug. 14, 2019) ("[T]he Petitioner's sentences of life without the possibility of parole do not directly contravene <u>Miller</u> because they were not mandatory but were imposed by a jury after a sentencing hearing in which the Petitioner was able to present mitigating evidence.").

In this case, the jury ordered a life sentence after a hearing at which the Defendant was permitted to present mitigation evidence, <u>see</u> Tennessee Code Annotated section 39-13-204(c), although he chose not to do such. Defense counsel made a brief opening statement regarding the Defendant's youth. The jury was afforded discretion to choose a life or life without parole sentence and exercised that discretion. The structure of the penalty phase of the trial comported with the protections articulated in <u>Miller</u>.

Moreover, during the pendency of this appeal, the United States Supreme Court issued its opinion in <u>Jones v. Mississippi</u>, 141 S.Ct. 1307 (2021). The Court held that "a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient" to satisfy <u>Miller</u> in cases when a juvenile commits a homicide and is subsequently sentenced to life without parole. <u>Id.</u> at 1313. The Court specifically rejected the defendant's argument that to impose a sentence of life without parole, the sentencer must also make an explicit or implied factual finding of "permanent incorrigibility." <u>Id.</u> Our supreme court has held that this court "must apply new rules retroactively to cases pending on direct review when the new rule is announced[.]" <u>State v. Minor</u>, 546 S.W.3d 59, 70 (Tenn. 2018). Accordingly, the Defendant's argument fails because no finding of incorrigibility is required to comply with <u>Miller</u> when a defendant is subject to a discretionary sentencing system.

### III. Policy Arguments

We wish to note that we have considered the Defendant's policy arguments regarding the special considerations applicable to juvenile offenders and their potential for rehabilitation. However, as stated above, the province of this court is to apply the law as it has been enacted by our legislature and interpreted by our supreme court, not to make

unilateral changes to established precedent. The Defendant is not entitled to relief on this basis.

CONCLUSION

After consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE